PATTERSON et al. v. BALTIMORE STEAM PACKET CO.

(District Court, D. Maryland. April 20, 1900.)

SHIPPING—CONTRACT FOR CARGO SPACE—CONNECTING LINES.

An engagement of cargo space on a steamship line for a shipment of cotton, made by a company operating a connecting line, constitutes a contract which binds the latter to furnish the cargo or respond in damages, although it was in fact made on behalf of a shipper intending to make a through shipment over both lines, where such fact was not disclosed.

In Admiralty. Libel in personam to recover damages for breach of contract engaging cargo space on steamer.

Brown & Brune, for libelants.

Lemmon & Clotworthy, for respondent.

MORRIS, District Judge (orally). The question for the court to determine is not what contract might have been made in the actual or supposed relations of the parties to each other, and as a result of such relations, but what contract the parties did in fact make. This was a commercial transaction, and commercial contracts, made by correspondence in the pressure of business, and not under advice of counsel, must receive a liberal construction to carry out the real intention of the parties; and in ascertaining this intention it is important to note, from their acts and declarations while the contract was in force and running, how the parties themselves treated it and acted under it. Here, after some preliminary correspondence as to the ocean

rate, a notification is sent by the Bay Line to the agents of the Johnston Line, reading as follows:

"Engagement No. 244.
"Baltimore Steam Packet Company. (Bay Line).
"Norfolk, Va., May 19th, 1898.

"Dear Sirs: We have this day booked with you, via Johnston Line, from Baltimore to Liverpool. 1,000 bales of cotton, at ocean rates, 26 cents per 100 pounds, sailing about late June, 1898.

"Respectfully, Wm. Randall, Agent.
"To Patterson, Ramsay & Co., Baltimore, Md."

That "engagement" was accepted by the agents of the Johnston Line, and the question here turns on its reasonable and fair interpretation. The contention of learned counsel for respondent, set up in the answer and forcibly presented in argument, is that this "engagement" did not, and was not intended to, constitute, a contract, but that the situation of these carriers operating connecting lines, their course of dealing and traffic arrangements, associated them in a joint enterprise, for their joint benefit, in procuring and transporting through freight from Norfolk, or the interior, to Liverpool on through bills of lading; that, as a result of this relation, the Bay Line, or its general agent acting for all parties in their mutual interest, became thereby the agent of the Johnston Line in procuring such through freight from outside shippers for joint account, and that therefore, in event of failure on the part of such shipper to furnish the goods for carriage, each carrier should sustain its own loss. That there might have been such an arrangement as is here contended for goes without saying. But here the "engagement" by the Bay Line is in its own name, and the contract is between the parties as independent contractors. The correspondence is inconsistent with any other meaning than that they understood between themselves that on the one side the cotton was to be furnished, and on the other side as much of the ship's space as 1,000 bales of cotton required was to be reserved and bound. The agent of the Bay Line did not say, "We offer to place for you," or "We have secured for you," or "As your agent have contracted." There was no pro rata division of through freight. The Johnston Line rate was fixed, and was to be the basis of any rate offered shippers by the agents of the Bay Line and other carriers, who were to get all they could obtain consistent with the fixed ocean rate of 26 cents. If there had been a rise in freights, the Bay Line might have made an increased profit, but under no circumstances could the Johnston Line have made any profit by such rise, because it was bound to furnish the space at the rate agreed on. I can see nothing in the relation of the parties or in the way they have treated the "engagement" to lead to the conclusion that the agent of the Bay Line at Norfolk was acting for both parties in a common undertaking. The parties behind the Bay Line by whom the goods were to be shipped (the immediate contractor with the Bay Line being the Seaboard Air Line Railroad) were not disclosed, and the vessel space was secured and reserved by and for the Bay Line. On June 21, 1898, the respondent sent the following letter to the libelants, who thereupon obtained the best paying cargo they could to fill the space of 1,000 bales of cotton

on their steamer, but the rate obtainable was lower, and there was a considerable loss:

"Baltimore Steam Packet Company (Old Bay Line).

"Key Compton, General Agent.

"Norfolk, Va., June 21st, '98.

"Mess. Patterson, Ramsay & Co., Baltimore, Md.—Dear Sir: Your favor 20th, relative to our engagement 244–1,000 B/C Liverpool, the contents of which I have carefully noted, and I confirm wire to you to-day stating that the Seaboard Air Line say that it is impossible to secure cotton to fill this engagement. They therefore ask that you fill the room with such other freight as you may be able to secure, and charge us with whatever loss you may sustain. I am very much obliged to you, and trust that you will be as liberal with the S. A. L. as you can, and kindly forward me bill for whatever loss you sustain.

"Yours, truly,        Key Compton, General Agent."

The fact that the bill forwarded to the Bay Line by Patterson, Ramsay & Co. was made out against the Seaboard Air Line, the next connecting carrier, does not affect the situation, because that was evidently done, as was testified, in order to fortify the Bay Line in its demand on the Seaboard Air Line after the contract had been broken. The contract on the part of the Bay Line bound it to furnish goods to the Johnston Line to fill the required space reserved and at the rate agreed, and to indemnify the Johnston Line in event of failure to do so. There being no contradiction in the evidence as to the amount of the damage, I will sign a decree for the libelants for that amount.